IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| NOELLE E. WATKINS, | ) | Case No. 3:24-cv-01570 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Noelle E. Watkins ("Watkins"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Watkins raises one issue on review of the Administrative Law Judge's ("ALJ") decision, arguing that the ALJ failed to identify substantial evidence supporting the residual functional capacity ("RFC") finding, failed to evaluate the medical opinion under the regulations, and failed to evaluate Watkins's allegations under the appropriate legal standards. This matter is before me pursuant to 42 U.S.C. 405(g), 1383(c)(3) and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Watkins's application for DIB and SSI be affirmed.

## II.    Procedural History

On May 26, 2022, Watkins filed applications for DIB and SSI alleging her disability began August 7, 2021. (Tr. 81). The claims were denied initially and on reconsideration. (Tr. 81-

1

83, 92). On March 6, 2023, she then requested a hearing before an ALJ. (Tr. 139-40). Watkins, with representation, and a vocational expert ("VE") testified before the ALJ on July 27, 2023. (Tr. 37-64).

On October 2, 2023, the ALJ issued a written decision finding Watkins not disabled. (Tr. 7-29). The Appeals Council denied her request for review on July 17, 2024, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). Watkins timely instituted this action on September 13, 2024. (ECF Doc. 1).

**III.      Evidence**

    **A.      Personal, Educational and Vocational Evidence.**

Watkins was 22 years old on the alleged onset date. (Tr. 22). She has at least a high school education. (*Id.*). She has no past relevant work. (*Id.*).

    **B.      Relevant Medical Evidence**

Records submitted from ProMedica Fostoria Hospital Show that on October 26, 2021 Watkins appeared for a psychiatric appointment crying and apparently very anxious. (Tr. 461). Watkins noted she had not seen her doctor in some time, and that she had not been taking her psychiatric medications regularly. (*Id.*). Without her medications she felt increasingly sad and anxious, and she was starting to "dissociate". (*Id.*). Watkins reported feeling sad, hopeless, and worthless, and she reported sleeping at least 12 hours daily. (*Id.*). She felt she could never work. (*Id.*).

At her next appointment, on November 30, 2021, Watkins mentioned she had witnessed her mother attempt suicide, and Watkins had quit her job because she was so overwhelmed and anxious. (Tr. 458-59). She reported that she was binge eating and was continuing to sleep excessively. (Tr. 459). On examination, Watkins was assessed with normal behavior and speech,

euphoric mood, normal affect and thought content, intact cognition and age-appropriate insight and judgment. (Tr. 460). At an appointment with her nurse practitioner on December 6, 2021, Watkins again stated that she was "mentally not able to work due to anxiety", but said she was happy with the psychiatric care she was receiving. (Tr. 375).

On January 25, 2022, Watkins again reported feeling "really anxious and depressed," to the point that she did not even want to leave her home. (Tr. 456). She was often angry, crying and isolating, and was experiencing thoughts of hurting herself. (*Id.*). She displayed a euphoric mood, and normal behavior, affect, thought process and content. (Tr. 457). On March 23, 2022, Watkins reported that while she had initially seen some benefit from medications she had recently been taking, she had recently felt her mood was decreasing, and she again felt depressed and unmotivated. (Tr. 451). She was feeling hopeless, worthless, moody, irritable, and anxious about finding a job. (*Id.*). On April 22, 2022, Watkins sought a letter from her nurse practitioner to excuse leaving work early because of an anxiety attack. (Tr. 450).

Watkins attended an appointment with her primary care doctor on April 27, 2022, to address anxiety exacerbations that had brought about panic attacks and vomiting while at her new job. (Tr. 360). She reported experiencing fear, anxiety, depression, and panic attacks her doctor found consistent with agoraphobia. (*Id.*). She was assessed with anxiety, severe episodes of recurrent major depressive disorder, acute stress reaction, agoraphobia with panic attacks, panic disorder, and tachycardia. (Tr. 361-62).

At a psychiatric appointment on May 3, 2022, Watkins reported that she was doing "really, really bad." (Tr. 448). Her anxiety had led her to quit her job, and she expressed a concern that she cannot work and "know[s] [she] won't ever be able to." (*Id.*). Watkins

3

expressed "wanting to die," but clarified that she did not actually mean that, and both she and her boyfriend denied any safety concerns. (*Id.*).

On May 24, 2022, Watkins reported that both she and her boyfriend had quit their jobs because people were "being mean" to them. (Tr. 357). She was having suicidal thoughts and had started attending a support group. (*Id.*). That same day, Watkins underwent a Mental Health Assessment at Serenity Christian Counseling, LLC. (Tr. 478-82). At the assessment, Watkins said that she felt her medications were ineffective, that she was very depressed and that she no longer enjoyed what she used to. (Tr. 478). She added that she experienced passive suicidal thoughts. (*Id.*). She reported experiencing trauma in her home as a child, including verbal and physical abuse from her mother and threats from her brother. (Tr. 479) She stated that she had been in special education classes for math. (*Id.*). She experienced ongoing binge eating. (Tr. 480). The provider assessed where with generalized anxiety disorder; bipolar II disorder; major depressive disorder, recurrent, severe, with psychotic features; and, attention-deficit hyperactivity disorder ("ADHD"), unspecified type. (Tr. 478).

At a psychiatric appointment on June 8, 2022, Watkins stated that she intended to apply for disability as she could not work because of anxiety and being physically unable to be around people for very long. (Tr. 444). She complained of depression and suicidal ideations, and noted that, consistent with her bipolar disorder diagnosis, she was experiencing days where she was highly motivated to clean. (*Id.*). She was sleeping 12 hours at a time and smoking marijuana regularly. (*Id.*) She reported that she had started attending counseling. (*Id.*).

At an August 31, 2022 psychiatric appointment Watkins reported that her current medication, Cymbalta, was effective, and had brought about a "good stretch of good days over the last month or so." (Tr. 507). She was struggling with her memory, focus, and concentration,

4

as she had been trying to manage her ADHD symptoms without medication, but she was now interested in restarting those medications. (*Id.*). That same day, at a counseling session, she appeared euthymic and mentioned enjoying an event she had attended and wanted to find work and begin exercising. (Tr. 576). At her next appointment on September 28, 2022, however, Watkins again appeared anxious and felt that she had symptoms consistent with a borderline personality disorder, including inappropriate anger, unstable relationships, and suicidal urges. (Tr. 584). She claimed symptoms including depersonalization and derealization. (Tr. 585).

On November 2, 2022, Watkins appeared depressed and agitated, and described the end of a friendship because of a poor experience on a recent visit to Los Angeles. (Tr. 596). At a separate appointment that day, she reported feeling helpless, hopeless, and worthless, again describing how poorly her trip to Los Angeles had gone. (Tr. 712). The next week, on November 9, 2022, Watkins appeared fatigued and dysphoric, which she attributed to beginning a new medication. (Tr. 599). She was still doing poorly at a psychiatric appointment on November 30, 2022, complaining of irritability, moodiness, and sadness. (Tr. 704). She had not been taking her medications for about two weeks and reported she had been having nightmares and visual hallucinations of bugs on her wall and crabs in her bed. (*Id.*). She also appeared fatigued and dysphoric at a counseling session on December 7, 2022, and reported having several nightmares since her previous session. (Tr. 620). Her psychiatrist suggested the possibility of a Post-Traumatic Stress Disorder ("PTSD") diagnosis. (*Id.*).

On January 11, 2023, Watkins reported to her counselor that she had not been taking her medication as prescribed and she was experiencing paranoid thoughts and increasing anxiety about leaving home. (Tr. 631) Her counselor advised her to take her medications, and suggested she begin attending counseling sessions twice weekly. (*Id.*). At a psychiatric appointment on

5

January 19, 2023, she again reported feeling depressed, and her suicidal ideations had been strong enough that she required intervention from a crisis response team. (Tr. 694). Watkins appeared depressed and tearful at her next counseling session on January 25, 2023, noting that her mother had been emotionally abusive to her. (Tr. 635). She also reported passive suicidal ideations and that she had not been taking her medication for about one week. (*Id.*).

On February 8, 2023, Watkins reported feeling bored and lonely, and stated that she was considering getting an "online job." (Tr. 644). By March 8, 2023, however, she was again struggling emotionally over her inability to "do things like other people such as work." (Tr. 684). She admitted feeling hopeless and having persistent suicidal thoughts, although she denied having a plan to harm herself. (*Id.*). She also admitted not having taken her medications in over two weeks and wanted to discuss trying different prescriptions. (*Id.*).

At a psychiatric appointment on March 29, 2023, Watkins stated that her counselor had diagnosed her with borderline personality disorder, which Watkins felt was consistent with her symptoms that included emotional lability, fear of abandonment, and mood issues including anger. (Tr. 676). Watkins reported that her new medications were helping her mood considerably, though it still fluctuated from day to day. (*Id.*). She has also been more motivated and has worked to take better care of herself. (*Id.*). At her May 10, 2023 appointment, Watkins again reported that her mood had been more positive, and that she had a more positive mindset. (Tr. 668).

By May 22, 2023, however, Watkins told her new counselor that her situation had recently become significantly worse. (Tr. 720). She reported experiencing symptoms that included unstable personal relationships, fear of abandonment, identity disturbance, impulsivity, suicidal behavior, affective instability, feelings of emptiness, dissociation, inappropriate anger,

nervousness, worry, restlessness, irritability, low interest, depressed mood, poor sleep, fatigue, and overeating. (*Id.*) She also complained of symptoms consistent with ADHD. (*Id.*). Her diagnoses included borderline personality disorder, ADHD, generalized anxiety disorder and major depressive disorder, recurrent episode, moderate. (*Id.*).

At a June 7, 2023 psychiatric appointment, Watkins again reported feeling "quite anxious and fairly depressed." (Tr. 727). She also reported feeling nervous about her upcoming disability hearing and starting a new job at a shoe store. (*Id.*). She felt very anxious at work and struggled to work through her entire shift. (*Id.*).

### C.  Medical Opinion Evidence

#### i.  State Agency Reviewers

On August 28, 2022, state agency reviewing psychologist Vicki Warren, Ph.D., opined that Watkins had moderate limitations in the domains of concentration, persistence and maintaining pace; interacting with others; and adaptation and managing oneself. (Tr. 68). Dr. Warren further opined that Watkins had no limitation in understanding, remembering, and applying information. (*Id.*). Dr. Warren noted moderate limitations in Watkins's ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (Tr. 70). On December 14, 2022, state agency reviewing psychologist Janet Souder, Psy.D., affirmed Dr. Warren's opinion.

On January 10, 2023, state agency reviewing physician W. Scott Bolz, M.D, opined that no severe physical impairment had been documented in the record. (Tr. 86-87).

#### ii.  Medical Source Statement

On October 18, 2022, Watkins's counselor, Lileigh Bower, MA, LPC, completed a residual functional capacity questionnaire. (Tr. 496-97). Bower noted diagnoses of bipolar II disorder; ADHD; generalized anxiety disorder; and major depressive disorder, recurrent, severe with psychotic symptoms. (Tr. 496). Bower reported seeing Watkins weekly, for one hour, and listed her prescribed medications as duloxetine, Concerta, and Vraylar. (*Id.*). Bower also wrote that Watkins "demonstrates appropriate appearance, dress and motor activity and orients to person, place and time." (*Id.*). Bower opined that Watkins had none-mild difficulties in understanding, remembering, and applying information and marked difficulties in interacting with others; in maintaining concentration, persistence, or pace; and in adapting or managing oneself. (*Id.*). Bower felt Watkins would be absent four or more times monthly, and would have marked limitations in her ability to complete an eight-hour workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Watkins would also have marked limitation in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and mild limitations in her ability to respond appropriately to changes in the work setting. (*Id.*).

### D.  Administrative Hearing Evidence

On July 27, 2023, Watkins testified before the ALJ that she was residing with her mother and stepfather. (Tr. 43). Watkins explained that she was applying for disability because of mental health reasons, although she does have irritable bowel syndrome. (*Id.*). She testified to being married, but separated, and she has no children. (Tr. 43-44). She completed high school but was in special education classes for math. (Tr. 44). She has never had a driver's license because she is

afraid to drive. (Tr. 45). She relies primarily on her stepfather or boyfriend of three years for transportation. (*Id.*).

Watkins testified she had last been employed at a shoe store in June 2023, but she only worked there for three days. (Tr. 46). She left that job because she was uncomfortable working as a manager, and she felt the employer had questioned her integrity. (*Id.*). She had previously worked at a factory, mostly packing car parts, and also as a cashier. (Tr. 46-47). Her prior jobs had both been part-time employment. (Tr. 47). She has not worked full-time because of her anxiety and depression which cause her to get physically sick in public environments. (*Id.*).

Watkins also testified that she cannot work due to "pretty severe" anxiety that causes her to get physically sick and have panic attacks and crying spells. (Tr. 47-48). She takes medications for her mental health and attends therapy sessions twice weekly. (Tr. 48). Her medications do cause side effects including seeing bugs crawling on the wall, spiders coming down from the ceiling or crabs on her bed. (*Id.*). In a typical day she makes herself coffee, feeds her cat, watches television, and listens to music, and interacts with social media friends. (Tr. 48-49). She usually has dinner with her parents and may do chores such as washing dishes if asked. (Tr. 49). She does not have friends other than online. (*Id.*). She will sometimes cook dinner, and she does her own grocery shopping. (*Id.*).

Watkins stated that she sees her brother, his girlfriend, and their 10-year-old daughter because her parents babysit their daughter every day. (Tr. 50). Watkins will sometimes watch their daughter herself, but because she is 10 years old, she is fairly independent. (*Id.*). Watkins's social media activity primarily consists of posting selfies and pictures of food she has made. (Tr. 51). She does participate in one mental health support group on Facebook. (Tr. 52). She does not drink alcohol, but she does smoke marijuana to help her with her anxiety. (*Id.*). She used to

9

smoke marijuana daily, now it is every couple of days, and mostly to help her sleep. (Tr. 53). Watkins testified that she does not believe she could a seated job sorting nuts and bolts all day because she cannot focus and concentrate for long periods of time. (*Id.*).

Under questioning by her attorney, Watkins testified that it is only about an hour or two per week where she is left to babysit her niece on her own. (Tr. 54). There has not yet been a day where she was responsible for her niece and her mental health symptoms interfered with her ability to do so, although she does have panic attacks daily. (Tr. 55). When she does have panic attacks, Watkins will become shaky, cry and occasionally vomit. (*Id.*). Although it used to happen nightly, she is having nightmares less often, but she does continue to have visual hallucinations. (*Id.*). Watkins attributes the decrease in nightmares to an increase of her Seroquel dosage. (Tr. 56).

Although she has a history of suicidal thoughts, she has not experienced any since she created a safety plan within the last couple of months. (Tr. 56-57). She tends to leave home every couple of days, either to go to a store or to an appointment. (Tr. 57). When she does go to a store and has to be around others, she often gets irritable and anxious and has to leave the store. (*Id.*).

Following Watkins's testimony, VE Mary Everts testified. (Tr. 58-63). As the ALJ determined there was no past relevant work to classify, she immediately posed her first hypothetical. (Tr. 58-59). The ALJ had the VE consider an individual of Watkins's age, education, and relevant vocational background with only non-exertional limitations. The individual was limited to short, repetitive tasks in a work setting with fast pace production or quota requirements, for example, no assembly line work; the individual was limited to occasional, brief and superficial interactions with supervisors, co-workers and the general public, with superficial defined as being in proximity of others, able to exchange greetings, and able to

engage in discussions that do not require persuasion or involve team or tandem tasks; the individual can work in an environment with infrequent changes; the individual can appropriately respond to constructive criticism from supervisors. (Tr. 59). The VE opined that such an individual could perform jobs such as laundry worker, DOT #361.685-018, medium exertional level, SVP 2, with approximately 10,000 jobs nationally; housekeeper, DOT #323.687-014, light exertional level, SVP 2, with 220,000 jobs nationally; and inspector/packer, DOT #559.687-074, light exertional level, SVP 2, with 7,000 jobs nationally. (Tr. 60).

When asked whether it would be work preclusive for an individual to be off task 20 percent or more of the time, the VE responded yes. (*Id.*). The VE opined that if an individual appeared to be responding to things that are not there that could be distracting to co-workers, causing the individual or their co-workers to be off task more than what is acceptable, and could therefore become "more preclusive". (Tr. 60-61). Finally, the VE opined that if an individual misses two or more days of work monthly, that would be work preclusive. (Tr. 61). The VE noted that employers expect workers to be on task at least 85 percent of the time and will tolerate no more than one absence per month, including coming in late and leaving early. (*Id.*).

On questioning by Watkins's attorney, the VE clarified that with goal-oriented jobs there is an expectation that an individual will be working at an average pace that is fairly equal with other co-workers. (Tr. 62-63). If someone is consistently falling behind that pace, they will be unable to maintain employment. (*Id.*).

## IV.     The ALJ's Decision

In her decision dated September 28, 2023, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2.   The claimant has not engaged in substantial gainful activity since August 7, 2021, the alleged onset date. (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: bipolar affective disorder, generalized anxiety disorder, attention deficit disorder, and borderline personality disorder. (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she can do short repetitive tasks in a work setting without fast paced production or quota requirements for example no assembly line work. She is limited to occasional, brief and superficial interactions with supervisors, coworkers and the general public. Superficial defined as, able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion or involve team or tandem tasks. She can work in a work environment with infrequent changes. She can appropriately respond to constructive criticism from supervisors.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on April 11, 1999, and was 22 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work. (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 7, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-40).

## V.     Law and Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;
2.    if not, whether the claimant has a severe impairment or combination of impairments;
3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S.

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court int, 127 F.4th 1000, 1004erference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

14

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.      Discussion

Although written as a single issue in her Brief on the Merits, Watkins appears to raise three distinct issues for this Court's review:

1.      Did the ALJ identify substantial evidence in support of the residual functional capacity finding?

2.      Did the ALJ evaluate the medical opinion pursuant to the regulations?

3.      Did the ALJ evaluate Watkins's subjective allegations pursuant to the proper legal standards?

(ECF Doc. 10, p. 1). The Arguments section of Plaintiff's Brief, however, does not address the first issue noted above. Accordingly, I limit my analysis to the second and third issues.

### A.      The ALJ applied the proper standard when evaluating medical opinions and prior administrative medical findings.

Watkins argues that the ALJ failed to evaluate the opinion of her counselor, Ms. Lileigh Bower, M.A., L.P.C, pursuant to the regulations. (*Id.* at p. 13). Specifically, Watkins contends that the ALJ failed to consider supportability and consistency when considering Ms. Bower's opinion. (*Id.* at p.14). She also argues that the ALJ, in determining Ms. Bower's opinion to be only somewhat persuasive, failed to discuss how Ms. Bower's objective findings, as described in her case notes, were insufficient to support the marked limitations Ms. Bower suggested. (*Id.* at p. 16). Watkins also claims the ALJ did not consider evidence that pre-dates June 2022 when assessing consistency, despite Watkins's alleged onset date of August 7, 2021. (*Id.*, at p. 17). Watkins alleges this evidence was "strategically omitted from the ALJ's decision" despite it being relevant to her difficulties when attempting to work and her response to work stressors. (*Id.* at p. 19).

15

The Commissioner responds that the ALJ properly evaluated Ms. Bower's opinion and sufficiently articulated both the supportability and consistency factors. (ECF Doc. 12, p. 10). The Commissioner argues that the ALJ wrote that Ms. Bower's treatment notes contradict her opinion, and notes that the entire opinion sets out a "comprehensive assessment of the medical evidence, which included findings from Ms. Bower's records." (*Id.* at p. 11). Those records, according to the Commissioner, "contain findings that are at odds with Ms. Bower's opinions that [Watkins] had a marked limitation in several areas of mental functioning. (*Id.*).

As for consistency, the Commissioner points out that the ALJ explicitly stated she had considered the record as a whole and discussed findings and other evidence from the record inconsistent with Ms. Bower's opinion. (*Id.*, at p. 13). The Commissioner contends that Watkins's arguments are just invitations to reweigh the evidence, an exercise beyond the purview of this Court. (*Id.* at p. 14). The Commissioner further argues that the ALJ considered all evidence, including what favored Watkins, and did not cherry-pick only unfavorable evidence. (*Id.* at p. 14-15). The Commissioner accordingly concludes that because Ms. Bower's opinions were not supported by her own treatment notes and were inconsistent with other evidence of record, there is substantial support for the ALJ's determination that Ms. Bower's opinion was only somewhat persuasive. (*Id.* at p. 16).

The Commissioner has the better of this argument. An RFC determination is a legal finding, not a medical determination; thus an "ALJ – not a physician – ultimately determines a claimant's RFC." *Peirce,* at 19, citing *Coldiron v. Comm'r of Soc. Sec.* 391 F.App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C 423(d)(5)(B)); see also *Nejat,* 359 F.App'x at 578. ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R.

404-1546(c)("[T]he administrative law judge…is responsible for assessing your residual functional capacity."). "[E]ven where an ALJ provides great weight to an opinion, an ALJ is not necessarily required to adopt wholesale limitations contained therein." *Harris v. Comm'r of Soc. Sec.*, No. 1:13-cv-00260, 2014 WL 346287, at 11 (N.D. Ohio Jan. 30, 2014) ("[T]he regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence' of record.").

"Although the ALJ may not substitute his opinion for that of a physician" in fashioning an RFC, the ALJ "is not required to recite the medical opinion of a physician verbatim in his [RFC] finding." *Peirce*, at 19; *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(3)). Thus, the ALJ's only duty is to "articulate how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R 416.920c, see *Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, at 5 (N.D Ohio, Feb. 28, 2018) Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. 416.920c.

Here, the ALJ made clear how she evaluated Ms. Bower's opinion, considering the factors of supportability and consistency. While noting that a counselor or therapist is not an accepted medical source for diagnostic purposes under the regulations, but is recognized as an "other source", the ALJ determined that Ms. Bower's opinion was "consistent with and

supported by the overall record with respect to the claimant's ability to understand, remember or apply information." (Tr. 21). In finding no limitation in this area, the ALJ wrote that Ms. Bower's examination notes described Watkins as "consistently alert and oriented," (*id.*) which supported her opinion. The ALJ further found that Watkins's testimony showed that she had graduated from high school and could read, write, and make change, and that the record "demonstrates no cognitive limitations," (*id.*) thereby addressing consistency.

In the domains of interactions with others; concentration, persistence and maintaining pace; and adaptation, however, while Ms. Bower opined that Watkins demonstrated marked limitations, the ALJ found that the record shows only a moderate limitation. (*Id.*). In the domain of interaction with others, the ALJ noted that Ms. Bower's examination notes, as well as those of other providers, "consistently describe her as cooperative, as do the records from other providers." (*Id.*). The ALJ adds that there is no record of Watkins having difficulty getting along with medical providers or their staff. (*Id.*). Despite claims of having no friends, Ms. Bower's notes show that Watkins has mentioned two friends, one of whom she travelled with to Los Angeles, and the other who planned to come visit. (*Id.*). Hearing testimony revealed that Watkins has been married and has a current long-term boyfriend, and that she shops in stores, although that will sometimes cause her to become agitated and anxious and require her to leave. (*Id.*). The references to Ms. Bower's examination notes specifically address the ALJ's perception that there is a lack of supportability for the suggestion of a marked limitation in this domain, while the references to other providers' notes and hearing testimony explains where the ALJ saw a lack of consistency with the record. Accordingly, substantial evidence supports her finding of a moderate limitation.

Similarly, when evaluating Ms. Bower's opinion about the domains of concentration, persistence and maintaining pace, and adaptation the ALJ writes that the record does not support marked limitations. (*Id.*) The ALJ cites to Ms. Bower's examination notes where she described Watkins's attention as "good, fair and/or intact." (*Id.*) The ALJ notes that Ms. Bower's notes also indicate that Watkins can cook, performing household chores, shopping for groceries and traveling out of state by airplane. (*Id.*)  The ALJ also writes that "there have been no periods of decompensation during the relevant period. Although there have been a few occasions where the claimant has requested an urgent visit with psychiatry, these are associated with times she has stopped taking her medications." (*Id.*). The ALJ also referenced Watkins's hearing testimony where she reported she could interact appropriately while babysitting her ten-year-old niece without experiencing crying spells. (*Id.*).

Based on the above, it is clear the ALJ considered the factors of supportability and consistency in evaluating Ms. Bower's opinion. Although the ALJ need not actually use those terms to show that they considered these factors, *Farrah W. v. Comm'r of Soc. Sec. Admin.*, 2024 WL 514496, *5 (S.D.Ohio Feb. 9, 2024), the ALJ points to several instances in the record when Ms. Bower's own examination notes do not comport with marked findings, thereby addressing the supportability question. The ALJ further compared Ms. Bower's opinion with other evidence in the record to show that the record as a whole did not support marked findings, indicating a lack of consistency. Accordingly, as the ALJ properly explained how she considered the factors of supportability and consistency, she met her burden to explain how she weighed Ms. Bower's opinion and built a logical bridge with substantial evidence that allows a subsequent reviewer to follow her reasoning.

Watkins further argues that the ALJ "failed to discuss the extent of the objecting findings contained in the treatment notes of Ms. Bower when rejecting her assessment of marked limitations[,]" (ECF Doc 10, p. 15) and contends that evidence that supports her arguments for disability was "strategically omitted from the ALJ's decision". (*Id.* at p. 19). In support of her position, Watkins offers evidence from the record that she argues supports her case. (*Id.* at 15-20). This, however, is simply an invitation to reweigh the evidence in her favor. *See Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022). Watkins did point to several instances in the record where Ms. Bower's examination notes do suggest mental health concerns that could potentially have justified granting greater weight to the opinion. This Court, however, when reviewing the ALJ's disability conclusion is "limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). The standard requires "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Under this deferential standard we do not "resolve conflicts in evidence, or decide questions of credibility." *Makela v. Comm'r of Soc. Sec.,* 2022 WL 9833285, at *2 (6th Cir. Oct. 17, 2022), citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). So long as substantial evidence supports the Commissioner's decision, this Court will not reverse "even if there is substantial evidence in the record that would have supported the opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). Here, the substantial evidence cited, and the ALJ's evaluation of the consistency and supportability of that evidence, require that the Commissioner's decision be left undisturbed. I therefore recommend that this argument be denied.

**B.     The ALJ evaluated Watkins's subjective allegations under the proper legal standard.**

Watkins argues that where the ALJ cited to her activities as the reason for disregarding Ms. Bower's opinion, she did so inaccurately. (ECF Doc. 10, pp. 21-22). Watkins further questions the ALJ's reliance on her interactions with medical professionals in assessing her ability to interact with supervisors, co-workers, and general public. (*Id.* at p. 22). Watkins also challenges the ALJ citing to activities conducted within the household as an indication of her ability to maintain concentration, persistence, and pace and adapt to her work environment. (*Id.* at p. 24). According to Watkins, "[t]he ALJ did not cite to evidence where the activities were performed unimpeded for extended periods, and the ALJ failed to explain how the activities show greater mental functioning in a work environment." (*Id.* at p. 25).

The Commissioner responds that the ALJ "properly evaluated the consistency of [Watkins'] allegations, applying several pertinent factors and concluded that [Watkins'] allegations of disabling level mental impairments were not entirely consistent with the record." (ECF Doc. 12, p. 17). Specifically, the Commissioner notes that the ALJ considered medical evidence that both detracted from and supported Watkins's allegations. (*Id.*). The ALJ also referenced Watkins's reported activities, including applying for part-time jobs, as well as her treatment and non-compliance history. (Tr. 17-18). In the Commissioner's view, the ALJ cited substantial evidence in support her evaluation of Watkins's subjective complaints, and arrived at a highly restrictive RFC that was within the bounds of reason. (Tr. 19).

When assessing a claimant's subjective statements, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Grames v. Comm'r of Soc. Sec.*, 815 F. App'x 820, 825 (6th Cir. 2019); *see also* SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017).

21

Next, the ALJ must consider the objective medical evidence and the claimant's reported daily activities, as well as several other factors, to evaluate the intensity, persistence, and functional limitations of the claimants symptoms. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1)-(3); SSR 16-3p, 2017 WL 5180304, at *4, *7-8 (Oct. 25, 2017). The evaluation of the plaintiff's symptoms rests with the ALJ, and "[a]s long as the [ALJ] cited substantial legitimate evidence to support his factual conclusions, we are not to second guess." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x. 165, 171 (6th Cir. 2020). The review here must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, *2 (6th Cir. March 15, 2023). Watkins's argument does not overcome this deferential standard of review.

The ALJ here found that Watkins's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 17). However, Watkins's statements on the intensity, persistence and limiting effects of those symptoms are not entirely consistent with the medical evidence and other evidence in the record. (Tr. 17-18). The ALJ added that Watkins's "allegations are considerably broader and more restricted than is established by the medical evidence." (Tr. 22). The ALJ notes that the record includes objective test results and treatment notes dated prior to the alleged onset date. (Tr. 18). Although the ALJ wrote, "a detailed analysis of the evidence dated prior to the alleged onset date is unwarranted" the ALJ nonetheless considered all evidence in the record and notes "that the residual functional capacity . . . accommodates all limitations supported by the medical record as a whole." (*Id.*).

The ALJ recounted the mental health treatment that Watkins received during the period in question, detailing the subjective concerns that she had described to her providers. (Tr. 18-22).

The ALJ noted that at an appointment in June, 2022 Watkins reported no current suicidal ideations but "that she was tired all of the time and has severe anxiety and depression," but the examination notes showed her to be:

> fully alert and oriented and she demonstrated no agitation or abnormal psychomotor activity. Speech was normal, associations intact, and thought process was goal directed. Her thought content was appropriate and she denied hallucinations, delusion, obsessions or compulsions. Further the client's attention was intact, as were her memory, insight and judgment.

(Tr. 18). At an August 31, 2022 appointment with her primary care provider, Watkins reported she "had been doing quite well recently, although she reported she continued to struggle with memory and difficulty with focus and attention." (*Id.*).

The ALJ further noted Watkins's contention that she had no "in-person friends" and only left home for appointments and to go to the store but contrasted that with a report of Watkins flying to Los Angeles with a friend. (*Id.*). She also continued to spend time with at least one friend and her boyfriend. (Tr. 19). The ALJ mentions Watkins's often expressed concern that her medications were not working well, (Tr. 18-19), but also reported several times when Watkins was not taking her medications consistently. (*Id.*). The ALJ also described several other visits to mental health providers when her self-described symptoms and the provider's observations were generally benign. (Tr. 19-20). Watkins reported times where she felt "more positive," (Tr. 19), when she felt her medications were helping her mood considerably, (Tr. 20), and where she felt her mood was more stable. (*Id.*).

Watkins correctly points out that "[c]ourts have 'cautioned against the use of a claimant's interactions with healthcare providers when assessing the capability to interact appropriately with coworkers and supervisors." *Dorsey v. Berryhill,* No. 3:18-cv-103, 2019 WL 1140178, at *5 (E.D. Tenn. Mar. 12, 2019). Here, though, while the ALJ considered Watkins's interactions with

medical providers in assessing her ability to interact with others, this was only one of many factors the ALJ included in determining that Watkins's limitations were moderate rather than marked in this domain. The ALJ specifically noted Watkins 'previous marriage and current long-term romantic relationship; her friendships with at least two individuals, one of whom was planning to visit her and the other she travelled with across the country; her ability to shop in stores; her applying for part-time jobs; and her ability to interact with her niece while babysitting. (Tr. 21). Each of these activities is consistent with a moderate finding, and also consistent with the social limitations imposed in the RFC of occasional, brief and superficial interactions with supervisors, coworkers, and the general public. (Tr. 16). As substantial evidence, including, but not limited to interactions with medical providers, supports the ALJ's assessment, this argument fails.

Watkins further contends that the ALJ relied too heavily on her activities of daily living in assessing her RFC "without explaining how her activities show greater mental functioning in a work environment." (ECF Doc. 10, p. 25). The Commissioner responds that "there is nothing in the ALJ's decision to suggest that the ALJ equated these activities with the ability to perform work activities. Rather, they were one piece of evidence among other evidence considered, including objective findings, treatment history and the prior administrative findings of the State agency psychological consultants." (ECF Doc. 12, p. 20) .Again, the Commissioner's argument prevails. SSR 96-8p provides that "[o]rdinarily, [residual functional capacity] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020). Here, in deriving the RFC the ALJ appropriately considered the activities of daily living highlighted throughout the record, along with the objective medical evidence, as required

by the regulations. The RFC evaluation was based on more than just the ALJ's conclusions that Watkins had the ability to perform activities of daily living, and instead was determined following consideration of the entire medical record as highlighted in detail throughout the decision. The RFC also contemplated the opinion of Watkins's therapist and the state agency consultants. Ultimately, the ALJ arrived at a restrictive RFC based on substantial evidence found in the entire record, consistent with the mandates of the regulations. Accordingly, I cannot recommend remand on this basis.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Watkins's application for SSI be affirmed.

Dated: April 14, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C

636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

***

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entire report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)